# SUPREME COURT

OF THE

## STATE OF MISSOURI

OCTOBER TERM, 1908.

*(Continued from Volume 218.)*

## W. J. SEAMAN v. CAP-AU-GRIS LEVEE DISTRICT, Appellant.

**Division One, March 31, 1909.**

1. **DRAINAGE DISTRICT: Employing Engineer.** Under article 5 of the Drainage Act (Secs. 8343 and 8328, R. S. 1899) the commissioners are authorized to employ an engineer to superintend the construction of the levees and ditches, to see that they are construed according to the specifications and contract.

2. ———: ———: **Commissioner as Engineer.** Article 5 of the Drainage Act does not contemplate that one of the commissioners may act as engineer of the board of commissioners, make surveys, profiles, plats and specifications, and then have the other two approve or disprove the same and report these facts to the county court. The drainage district is by the act placed under the supervision and control of a board of commissioners of "three competent persons," and those duties are enjoined upon the three, not upon two of them; and the intent of the act is that the scheme of drainage and the plan of construction shall have the endorsement of all the three commissioners, and that can not be where one of them abdicates his duties as commissioner and assumes the role of engineer for the commission.

3. ———: ———: ———: **Sec. 8336.** Section 8336, Revised Statutes 1899, in express terms declares that the commissioners of a drainage district "shall not, during their term of office, be

interested, directly or indirectly, in any contract for the construction of any ditch, drain or levee in such drainage district, nor in the wages or supplies to men or teams employed on such work;" and that makes illegal and void any contract of employment by two of the commissioners of the third to act as engineer to draw up the plans, specifications, maps, profiles of the district, and to superintend the construction of the levees and drains and see that they are constructed according to the specifications. Such a contract of employment is in direct violation of that statute.

4. ———: ———: ———: ———: **Retaining Benefits: No Power of Restitution.** And the commissioners being by section 8336 absolutely prohibited from employing one of their number as engineer to do the engineering work of the drainage district, the member so employed cannot recover from the district the value of the work done by him as engineer; nor is the district inhibited from invoking the invalidity of the contract for that the work was fully performed, in good faith, and was worth the amount promised, and was beneficial to the district, and it retains that benefit and cannot make restitution.

Transferred from St. Louis Court of Appeals.

REVERSED AND REMANDED (*with directions*).

*W. A. Dudley* for appellant.

(1) The contract for services as engineer made by plaintiff with the board of commissioners was *ultra vires* and void. Drainage Dist. v. Daudt, 74 Mo. App. 579; Frissell v. Williams, 87 Mo. App. 518; Drainage Dist. v. Jamison, 176 Mo. 557. And warrants or orders issued in payment for services performed under said contract were without consideration and void. R. S. 1899, sec. 8343; Gamble v. Gibson, 59 Mo. 585; State to use v. Hunt, 46 Mo. App. 623; Condit v. Fowler, 47 Mo. App. 518; Williams v. Chariton Co., 85 Mo. 645; Galbreath v. Moberly, 85 Mo. 487; State ex rel. v. Brown, 146 Mo. 401; 9 Cyc. 481. (2) The order sued on in the 16th count included engineering, and was indivisible and point 1 applies to it. Sumner v. Sumner, 54 Mo. 340; Door Co. v. McMahan, 81 Mo. App. 440; Bich v. Elliott, 45 Mo. App. 475; Clark

on Contracts, sec. 204. Seaman and Brimm, being no longer officers, had no right to issue it. State ex rel. v. Perkins, 139 Mo. 116. Being invalid, evidence of ratification was erroneously admitted. Drainage District v. Daudt, 74 Mo. App. 579. (3) Defendant had no power or authority to issue interest bearing warrants. The Drainage Act contemplates cash payments by means of assessments or restricted loans on the bonds of the district. Section 8338 of the act excludes the idea of making every obligation of the district the basis of a floating, interest-bearing debt. No specific demand being pleaded or proven, it was error to allow interest from date on any of the counts. Skinner v. Platte County, 22 Mo. 437; Isenhour v. Barton County, 88 S. W. 757; 11 Cyc. 541. On the face of the warrants the findings on the 2d, 3d, 4th, 5th, 6th, 7th and 8th counts are excessive. (4) The reports of the commissioners and the judgments of the county and circuit court were erroneously admitted and considered by the court. The warrants could not be ratified or validated in that way either on general principles. Hyde v. Larkin, 35 Mo. App. 365; Winsor v. Bank, 18 Mo. App. 665; McFarland v. Heim, 127 Mo. 327. Or as against a public corporation. Hildelberg v. St. Francois Co., 100 Mo. 69; McKissick v. Township, 48 Mo. App. 416; Kane & Co. v. School District, 48 Mo. App. 408; Drainage District v. Daudt, supra. (5) The suit being on the orders, the court erred in allowing and considering proof that the services rendered by plaintiff were reasonably worth five dollars per day. Clements v. Yeates, 69 Mo. 625; Cole v. Armour, 154 Mo. 351.

*Norton, Avery & Young* for respondent.

(1) The principle contended for by appellant in point 1, of his brief, is in no way supported by the authorities cited. In the case of Patrick v. Boonville

Light Co., 17 Mo. App. 468, the court lays down this doctrine: "A managing officer of a corporation may make a valid contract with the corporation, provided he deals openly with other members of the corporation who have full power to act in the premises. Contracts thus entered into are presumptively valid," etc. Bennett v. Roofing Co., 19 Mo. App. 349; Taussig v. Railroad, 166 Mo. 28. (2) But appellant contends that there is a difference between private corporations and corporations such as the appellant in this case. In our own State the question has never been directly before our courts that we can find. Niles v. Muzzy, 33 Mich. 61; Macon v. Huff, 60 Ga. 221; Thomas v. Railroad, 101 U. S. 71; Argenti v. San Francisco, 16 Cal. 256. (3) At the present time the defense of *ultra vires* is very generally regarded as an ungracious and odious one, and it is very well settled that neither party to a contract can avail himself of the defense when the contract has been fully performed by the other party. 29 Am. and Eng. Ency. Law, 45; Hawkes v. Railroad, DeG., M. & G. 760; Cary v. Cleveland, 29 Barb. 36; St. Louis v. Gaslight Co., 70 Mo. 69; Sav. Inst. v. Board of Ed., 75 Mo. 408; Bank v. Gilliland, 72 Mo. 77; Ins. Co. v. Hauck, 71 Mo. 465. See, also, 63 Mo. 118; U. S. v. Brindle, 110 U. S. 688. The evidence shows that the work was well done; that it was work that had to be done of necessity that the district might be completed; that respondent spent about three hundred days of his time, talents and energy in the construction of this district; that it was work outside and entirely independent of his duties as commissioner, work that could have been done by any competent person; that the charges were reasonable and that he did not seek the place, but his services were sought by the other two commissioners because he was considered the best man in the county for the position; that there was no "log-rolling" by him or the other commissioners in his getting the place, nor

was there any fraud or wrongdoing connected with the whole transaction. The services performed were professional services, and not services in the mechanical construction of the levees and ditches; the commissioners in the district accepted the work after it had been fully performed, and gave him these written evidences of acceptance; the commissioners appointed in 1897 succeeding these commissioners also accepted the situation, acknowledged the indebtedness, so reported to the county court and had an additional assessment made for the payment of this indebtedness and the accrued interest thereon; the county court ordered the assessment for this purpose, and ordered the commissioners to collect and pay to respondent these amounts, and this judgment was affirmed by the circuit court of the county; the assessments were made, and the money was and is being collected on these assessments for this purpose; everything connected with the whole transaction was open and fair, no effort made to hide anything, and in our opinion appellant is estopped from making any such defense after receiving the work and enjoying fully the fruits and benefits thereof.

WOODSON, J.—This suit was brought in the circuit court of Lincoln county, by the plaintiff against the defendant, on sixteen orders or warrants issued by it, payable to him or order, in payment of services performed by him as commissioner and engineer in the construction of certain levees and ditches in said drainage district.

The petition contained sixteen counts, each of which alleges the incorporation of the defendant, substantially, as in the first count, that on the 6th day of July, A. D. 1896, by order of its board of commissioners, and by its legally constituted officers, to-wit, William Brimm, president of its board of commissioners, and W. J. Seaman, secretary, defendant made,

executed and delivered to this plaintiff its negotiable written obligation directing its treasurer to pay him the sum of one hundred dollars, which said written obligation or order is herewith filed, and marked exhibit "A," and which written order or obligation obligated itself to pay to the order of this plaintiff, W. J. Seaman, one hundred dollars in words and figures as follows, to-wit:

"No. 97.   Office of the Board of Commissioners of the Cap-Au-Gris Drainage and Levee District.

$100.00

"To the Treasurer of the Board of Commissioners of the Cap-Au-Gris Drainage and Levee District, Lincoln County, Missouri: Pay to the order of W. J. Seaman, the sum of one hundred dollars for engineering out of any funds in your hands. This warrant bears interest at the rate of six per cent per annum from date. Given at Winfield, Mo., this 6th day of July, 1896. By order of the Board.

"W. BRIMM, President.

"Attest: W. J. SEAMAN, Secretary."

Alleges presentment of order in due time to the treasurer for payment and divers times since, failure and refusal to pay, and demands judgment for the amount with six per cent interest from date of the order.

The other counts are in the same form with the following variations only, occurring in the copy of the orders:

Second count, Exhibit B., No.  98, $100.00.
Third count, Exhibit C., No.  99, $100.00.
Fourth count, Exhibit D., No. 100, $100.00.
Fifth count, Exhibit E., No. 101, $100.00.
Sixth count, Exhibit F., No. 102, $100.00.
Seventh count, Exhibit G., No. 103, $100.00.
Eighth count, Exhibit H., No. 104, $100.00.

Ninth count, Exhibit I., No. 105, $84.00 for "expenses."

Tenth count, Exhibit J., No. 106, $55.00 for "commission fee."

Eleventh count, Exhibit K., No. 140, $12.90 to the "order of Dodge, Cochran & Co., for levee work," dated September 3, 1896, alleging also assignment of the order to plaintiff.

Twelfth count, Exhibit L., No. 208, $100.00, "for twenty days engineering," dated September 5, 1896.

Thirteenth count, Exhibit L., No. 209, $100.00, "for twenty days engineering," dated September 5, 1896.

Fourteenth count, Exhibit M., No. 210, $31.00, for five days engineering and three days commission fees, September 5, 1896.

Fifteenth count, Exhibit N., No. 211, $7.80, for expenses, September 5, 1896.

Sixteenth count, Exhibit O., No. 238, $115.07, "for engineering, commission fees and expenses," February 20, 1897.

In the answer defendant alleged that it was incorporated under the Drainage Act approved April 1, 1893; that W. J. Seaman named in each of the counts of the petition as secretary of the board of commissioners and the plaintiff was one and the same person; that engineering set up as the consideration of the order mentioned in the first, second, third, fourth, fifth, sixth, seventh, eighth, twelfth, thirteenth, fourteenth and sixteenth counts of the petition was done, if done at all, while plaintiff was one of defendant's board of commissioners, under a pretended contract with said board whereby he was to receive five dollars per day; that such contract was illegal, against public policy, unauthorized by law, and in violation of sections 19 and 26 of said act of 1893, and that said orders were without consideration and void. It is further pleaded that said contract was for an amount

exceeding five hundred dollars and was not let to bidders as required by law. The execution of the order described in count No. 16 was also denied under the oath of the president of the board. Counts No. nine, ten, eleven and fifteen were not controverted in the answer.

The facts are not disputed and are as follows:

"The defendant drainage district was organized in Lincoln county, Missouri, under the laws of 1893, and embraces about 3,300 acres of land on the bottoms of the Mississippi River in said county. It being the same drainage district involved in the case of State ex rel. v. Wilson, 216 Mo. 215.

"The county court in appointing commissioners for this levee district, as was its duty under the statute, appointed plaintiff, William J. Seaman, as one of the commissioners, and at the same time appointed William Brimm and W. A. J. Sitton as commissioners with him.

"At a regular meeting of these commissioners, as shown by the evidence, in the judgment of the commissioners it became necessary to appoint a civil engineer to take charge of the construction of the levees and ditches in the district.

"The plaintiff, as shown by the transcript, not voting himself, was by the other two commissioners elected to the position of engineer. This was done at a regular meeting of the commissioners, and a proper record made thereof. The plaintiff, Mr. Seaman, accepted the position and took charge of this part of the work in the laying off, construction, building, measuring and completing the levees in said district, working at the same, as shown by the evidence, some two hundred and fifty or three hundred days.

"The levee was completed, accepted by the commissioners and by the county court. The assessments for the construction of the levee were made payable

by installments, a large part of these installments maturing after the completion of the levee.

"From time to time as this work was done, this plaintiff, as well as all other persons working in any department of the levee construction, would present their accounts to the commissioners, and for want of cash on hand to pay, the commissioners issued scrip, or these warrants or orders sued on in this case, in payment for the work.

"Seaman, the commissioner, and this plaintiff, in the course of his work as commissioner and as engineer, received in payment therefor the scrip, orders or warrants that were sued on in this case and offered in evidence.

"When the levee was completed it was found that it would require another assessment of some ten thousand dollars to pay the outstanding indebtedness made necessary in the construction of the levee of which plaintiff's warrants were a part.

"The commissioners so made their report to the county court, showing the indebtedness of the levee district above the funds on hand arising from the first assessment to pay the same, to be about ten thousand dollars. The indebtedness by the commissioners was itemized and included these warrants or orders of plaintiff sued on.

"The county court on this report of the commissioners ordered an assessment payable in five installments, the first installment payable in July following the assessment, and the others following annually. An appeal was taken to the circuit court, and the circuit court affirmed the judgment of the county court, and the assessments were made.

"For the lack of funds these warrants have never been paid, hence this suit.

"The evidence shows that the work was necessary, that the work was done for a fair price and in a satisfactory manner, and that Seaman in his employment

was employed by the other two members of the commission.

"The evidence further shows that from time to time in the reports made by this commission, and by the commissioners following them, this indebtedness of plaintiff was recognized and the warrants issued therefor were recognized as a proper indebtedness of the district, and that the orders and judgments both of the county court and the circuit court so held.

"It was admitted that W. A. J. Sitton, William J. Seaman and William Brimm were commissioners of the defendant district from the thirteenth day of February, 1894, until their successors were appointed and qualified, as shown by the evidence, in 1897. Mr. Brimm was president and Seaman was secretary.

"William J. Seaman testified that he was the plaintiff and was secretary of the board of commissioners of the levee district during the year 1896 and until February, 1897. Identified the warrants or orders sued on in this case and the signatures thereto. Testified that these warrants were issued by the board to him, except the one issued to Cochran & Company, which was properly assigned. He performed services as engineer for the district. Was employed by Brimm and Sitton. Plaintiff then offered the record in the levee company to show the issuing of the warrants sued on, to which counsel for defendant objected for the reason that with the exception of vouchers 105 and 106, the vouchers are for services as engineer. This district was organized under the Act of 1893, and Seaman had no right to accept employment under the statute.

"THE COURT: There is no charge that there was anything wrong with the manner in which the work was done?

"MR. DUDLEY: No, we don't know anything about that.

"The Court: There is no controversy whether it was properly done?

"Mr. Dudley: We don't charge that it was improperly done, but done contrary to the statute and public policy.

"Plaintiff introduced record of the levee district showing that Treascott, Killam and Magruder had their first meeting and organized the twentieth day of February, 1897, and that on the same day and date the former commissioners, Seaman, Brimm and Sitton, met with their successors, disorganized and turned the record over to their successors.

"Plaintiff then introduced page twenty-nine of the record of the levee district showing resolution appointing W. J. Seaman as engineer, and fixing his salary at five dollars per day.

"Plaintiff then resumed examination of witness Seaman, who testified that he did the work for which these vouchers were issued, that it was reasonable and that he reported to the commissioners, and they received and accepted his work, and by order of the board the warrants sued on were issued.

"On cross-examination Mr. Seaman testified that all of the work done for which suit is brought was done while he was one of the commissioners, and that he was secretary of the board at that time.

"Mr. Norton: What did you say about separation of the work of engineer and commissioner? A. It was itemized. The work for commissioner is itemized as commissioner, and the work as engineer is separate from that and issued as engineer. When I performed services as engineer I did not receive compensation as commissioner, and when I worked as commissioner I did not receive compensation as engineer.

"Examination by the Court: Q. You only received one compensation? A. Yes, sir. Q. Was this work done under the direction of the board? A. Yes, sir;

by their order. Q. Were they posted as to the detail of the work? A. Whenever it was necessary to consult them they were called in and we had a meeting. The commissioners acted on my report and accepted it.

"Re-Cross Examination: Q. What was the character of the work you rendered as engineer? A. Laying out, measuring and leveling, measuring the work done and accepting it when it was done. Seeing it was done according to contract, inspecting the work done and reporting to the board.

"By the COURT: Q. The work was done by contract? A. The contract was let to Dodge, Cochran & Co., they built the work and I looked after the engineering and seeing that they did their work according to specifications. Mr. Killam and Duey had part of the work, which was two different companies.

"Plaintiff then introduced the final report filed March 1, 1897, of commissioners Brimm, Seaman and Sitton for the purpose of showing that they reported to the court as issued by them, and unpaid, all warrants sued on here, besides many others.

"Plaintiff also introduced a report of commissioners filed in the county court July 15, 1896, showing the issuance and outstanding of a part of the warrants sued on in this case, to-wit, the warrants described in the first ten counts.

"Plaintiff then introduced a report of commissioners Trescott, Killam and Magruder, filed October 15, 1897, wherein they ask for an additional assessment, and in showing the indebtedness of the district included all of the warrants sued on in this case.

"William Brimm testified that he was one of the commissioners in 1896 and 1897, and as such commissioner voted for the employment of W. J. Seaman as engineer and fixed his salary at five dollars per day. We accepted his services and approved them, and issued the warrants sued on for services.

"Cross-Examination: The mechanical work was let by contract. There was no letting the contract for engineer to the highest bidder. There were about 3,300 acres in the district. The levee was something like six miles. Ditch on one side nearly two miles long. It was laying out this ditch and inspecting the work as it progressed that this engineering was principally done.

"By the COURT: Who drew the plans and specifications? A. Mr. Seaman, and upon these plans and specifications the work was let, and he continued to superintend like an architect seeing that it was done according to plans and specifications.

"W. A. J. Sitton testified: I was one of the commissioners. Voted for the employment of Seaman as engineer. I suggested Mr. Seaman to Mr. Brimm because I thought he was the best man for that business that we had in the county. We had to have an engineer and surveyor and a good one, and I suggested Mr. Seaman to Mr. Brimm, and we agreed on him and employed him and fixed his salary at five dollars per day. While he was acting as engineer he did not charge as commissioner, and when acting as commissioner he did not charge as engineer. In the meeting of the commissioners when he was employed as engineer, Mr. Seaman took no part, he did not say anything.

"Examination by the COURT: Q. Did he take any part in fixing the compensation? A. No, sir. Q. Was his work satisfactory? A. It was in good shape. Q. Are you satisfied his services were worth the sum you agreed to pay him? A. I think they were easily worth it. Q. Did you think this work was necessary? A. Yes, sir. We couldn't do anything of that kind without it. It would be impossible to get ditches there like that without it. Q. He was the best man you thought? A. He was the best man in the county in my opinion.

"Plaintiff then introduced certified copy of the record of the county court in November, 1897, showing an additional levy to pay warrants sued on in this case and others, and also the record of the circuit court made the ninth day of April, 1898, showing that on appeal from the county court the circuit court adjudicated this matter and made the additional levy, and that this levy was founded on the report of the commissioners showing the indebtedness sued on here, and other indebtedness in the construction of the levee.

"The warrants or orders sued on were introduced and read in evidence. County Court Record J., page 467, of Lincoln county, was introduced showing the approval of the final report of commissioners Seaman, Sitton and Brimm. It was admitted that the defendant was incorporated under the Act of 1893."

At the close of testimony, the defendant asked, and the court refused to give the following instructions, to which action of the court defendant duly excepted, to-wit:

"1. The court declares the law to be that the employment of the plaintiff by defendant's commissioners for the performance of the work mentioned in the first, second, third, fourth, fifth, sixth, seventh, eighth, twelfth, thirteenth and sixteenth counts of the petition at the price and sum of five dollars per day and the issuance of the warrants or orders mentioned in said several counts in payment therefor, were *ultra vires,* illegal and void and as to said counts the findings will be for defendant.

"2. The court declares as a matter of law that the witnesses Seaman and Brimm had no authority to issue the warrant or order mentioned as described in the sixteenth count of the petition, their terms as commissioners having expired prior to the issuance of said warrant, and as to said count the findings will be for the defendant.

"3. The court declares as a matter of law that there can be no recovery on the fourteenth count except for three days' services as commissioner, the sum of six dollars, and interest on said sum at six per cent per annum, from the 5th day of September, 1897, to this date."

The trial resulted in a judgment for plaintiff for the sum of $1,946.81; and after filing proper motions for new trial, etc., an appeal was duly taken by defendant to the St. Louis Court of Appeals. The latter court transferred the cause to this court because the defendant was a public political sub-division of the State, as held by this court in the case of Morrison v. Morey, 146 Mo. 543, which fact gives this court exclusive jurisdiction of the case on appeal.

I. It is conceded in this case that the appellant is a drainage district of Lincoln county, incorporated under the Drainage Act of 1893, now article 5 of chapter 122, Revised Statutes 1899; and that under section 8322 thereof the county court of said county, on February 13, 1894, appointed the respondent, W. J. Seaman, William Brimm and W. A. J. Sitton commissioners to lay out and construct the levees and ditches provided for in said district. On March 27, 1904, the board of commissioners elected said Seaman secretary of the board, and also appointed him engineer, and agreed to pay him five dollars a day for his services as such engineer. All of the work for which the warrants in suit were given was performed by respondent while he was a member of said board; and those sued on in the first, second, third, fourth, fifth, sixth, seventh, eighth, twelfth and thirteenth counts were for services performed by him as engineer, and those sued on in the fourteenth and sixteenth counts were given, respectively, for services performed by him in his capacity as commissioner and as engineer, the former for five days as engineer and three days as commissioner, and

the latter does not state what number of days he was allowed for as engineer or as commissioner. All the remaining warrants were given for services performed by respondent as commissioner and for expenses, the validity of none of which is challenged.

Section 8343, Revised Statutes 1899, fixes the salary of each commissioner at two dollars per day and expenses, but as respondent's salary as commissioner or his expenses are not challenged by this suit, it will be unnecessary to further discuss this branch of the case.

Section 8328, Revised Statutes 1899, provides as follows: "If the commissioners report that the whole cost of such proposed work will be less than the benefits resulting therefrom, they shall proceed to have the proper surveys, profiles, plans and specifications made therefor, and shall report to the court their conclusions thereon, with a copy of such surveys, profiles, plans and specifications, and their recommendations as to the best and cheapest method of doing the proposed work."

And section 8335, Revised Statutes 1899, authorizes and empowers the commissioners to do any and all acts which may be necessary in and about surveying, laying out, constructing, repairing, altering, enlarging, cleaning, protecting, maintaining any such drain, ditch, levee, etc., authorized to be done under said article.

We suppose the commissioners by the two latter sections were fully authorized and empowered to employ an engineer whenever his services were necessary in the prosecution of the work upon the drainage system; at any rate, counsel for appellant does not deny the power of the commissioners to employ an engineer when his services are necessary, but he does challenge their authority of employing one of their own number as such engineer; because, he says, section 8336, Re-

vised Statutes 1899, expressly prohibits them from doing so.

Said section 8336 reads as follows:

"In all cases where the work to be done at any one time under the direction of the commissioners shall, in their opinion, cost to exceed $500, the same shall be let to the lowest responsible bidder, and the said commissioners shall advertise for sealed bids by notice published in some newspaper issued in the county in which the petition is filed, and if there be no newspaper issued or published in said county, then in some newspaper published in an adjoining county; which said notice shall particularly set out the time and place, when and where, the said sealed bids will be opened, the kind of work to be let, and the terms of payment. Said commissioners may continue the letting from time to time, if in their judgment the same shall be necessary, and may reserve the right to reject any bid and all bids. And said commissioners shall not, during their term of office, be interested, directly or indirectly, in any contract for the construction of any ditch, drain or levee in such drainage district, nor in the wages or supplies to men or teams employed on any such work in said district."

Passing over without discussing that clause of the section which requires all contracts for work to be performed which shall cost more than $500 to be let to the lowest and best responsible bidder, etc., to that clause thereof which provides that "said commissioners shall not during their term of office be interested, directly or indirectly, in any contract for the construction of any ditch, drain or levee in such drainage district, or in the wages or supplies to men or teams employed on any such work in said district."

By reading said article 5 of chapter 122 one will be impressed with the idea that it was the intention of the

Legislature to have these drainage districts, which are public corporations, placed under the supervision and control of a board of commissioners composed of three suitable members who are authorized and directed by statute to have surveys and profiles, maps and plats made of the proposed work to be done, and to do all other things necessary to construct, maintain and keep in repair the levee system in each and every drainage district. Those duties are enjoined upon all three of the members of the commission and not upon two of them only. While it is true section 8325 provides a majority of the commissioners shall constitute a quorum, and that a concurrence of a majority of their number upon any proposition shall be considered as the act of the district, yet the whole article contemplates that all the members shall serve when present, and that a concurrence of a majority of them upon any proposition shall be considered the action of the board, or commission. If otherwise it was the intention that only two were to act when all were present, then there could be no action of the board whatever where those two failed to concur upon any proposition.

Not only does this general idea run through the entire article, but it permeates and is given expression in each and every section thereof. Sections 8328 and 8335, the ones which empower the commission to employ an engineer, in express terms provide that the commissioners, not one or two of them, but the commissioners, shall have the surveys made as commissioners and not as engineers, and they shall do all things necessary to carry into effect the intention and object of the act, namely, the construction and maintenance of the drainage system. Those duties are numerous and important, requiring the exercise of wise discretion and sound judgment on the part of "three competent persons," whom the law requires the county court to appoint as commissioners

By reading sections 8328 and 8330 it will be seen that the surveys, profiles, plats and specifications required to be made by the engineer constitute the whole foundation and fabric upon which the levee system is to be constructed. From those the area of the district, the number and size of the levees and drains are to be determined, as well as what lands will be benefited or damaged by the proposed improvements; and also the cost of the work and the assessments of the taxes to be made upon the lands out of which the improvements are to be paid.

Clearly, it could not have been the intention or purpose of the Legislature to have one of the commissioners to act as an engineer of the board, make the surveys, profiles, plats and specifications and then have the other two approve or disapprove the same, and report these facts to the county court, as required by section 8330. The other two commissioners might not always agree and doubtless did often disagree as to just what the survey in many of its details, if not in its general plan and scope, should be and should show; and in all such cases there could be no report made by the commissioners to the county court as contemplated and required to be done by said section 8330; but if upon the other hand the commissioners, all three of them, as provided by the act, should act together, then probably most, if not all, portions of the surveys, profiles, maps and specifications could be agreed upon by a majority of the commission, if not by all of them, and thereby enable them to report to the county court as required by law. But independent of the foregoing observations, the clear intent of the act is that the scheme of drainage and the plan of its construction should have the endorsement of all the members of the commission, and the act makes it their duty to see that the work is done according to the plans and specifications on file with the county court, and the work after its completion should have their approval and be ac-

cepted by them. That could not be done where one of their number abdicates his seat as commissioner and assumes the role of engineer for the commission; nor could he act in both capacities, for the reason that the law would not tolerate or permit the engineer to make the surveys and construct the drainage system in pursuance thereof, and then take his seat upon the commission with the other members thereof and vote for its approval and acceptance. It would be farcical to authorize an engineer to have the work done under his orders and supervision and then permit him to vote for its approval and acceptance.

In discussing a similar question the Supreme Court of Georgia in the case of Macon v. Huff, 60 Ga. l. c. 224, used this language:

"The first question, and the great question argued before us with great research and ability by the able counsel on both sides, is this, could Huff, whilst mayor of Macon, and ex-officio president of council, make the contracts which are set out in the record, and legally bind the city thereby?

"The fundamental principle which will be found to underlie all adjudications made in this State on similar questions, and which, we think, has not been upset by any well-considered case anywhere, is that no officer or agent, public or private, whose duty it is to supervise a contract in behalf of his employers or principal, can himself undertake to do that thing which his office or agency makes it his duty to supervise for others, and to see to it for them that it is well and faithfully done. The reason is too plain and palpable for serious dispute. The man becomes a judge in his own case. He agrees to perform work himself, and yet is to judge whether or not it is well done. So tender is our law of bias on the part of the noblest and purest in behalf of self-interest, that no judge is permitted to sit in a cause in which he has any interest. If a relative by blood or marriage within a certain degree

is interested, he cannot sit and determine the case. The same principle applies to jurors and to all courts; Federal, State or municipal. Ever since the Yazoo fraud, this has been the policy of this State. In 1801 an act was passed 'that no judge or justice of any court, no ordinary justice of the peace, nor presiding officer of any inferior court or commission, can sit in any cause or proceeding in which he is pecuniarily interested, or related to either party within the fourth degree of consanguinity or affinity, nor in which he has been of counsel.' [See Code, sec. 205; Cobb's Digest, 460.] Therefore, in the mayor's court of the city of Macon, Mr. Huff could not sit in a cause between himself and the humblest citizen of the city, involving the slightest breach of propriety or the smallest amount of money. Yet the effect of these contracts is to make him every day the judge in his own case. He has contracted for money to do certain work for the city, and as mayor of the city and its chief executive officer, it is his official duty to see that this work is well done. He contracts to cut and haul wood to the poor; to fence and keep in repair the fencing of a very large piece of ground, involving heavy and continuous expense, to levy the river or drain the lagoons and keep the park dry as far as practicable, to gravel the walks and keep them in order, in fine, to keep the whole park in perfect order for the term of five years. His administrative and executive duties as mayor require him to overlook and judge of the extent and manner in which, as contractor, he discharges these obligations. Can he do it disinterestedly? Possibly he may; but the law regarding our fallen nature as all weak, and profiting by the prayer which the Son of God prescribed for all men, forbids that such temptation be laid in the path of any man, however exalted his office or pure his character. How would it look for Governor Colquitt, while in office, to lease for himself the penitentiary convicts, or the State road, or Macon and Brunswick

road, when it is his official duty to see to it that the lessees carry out faithfully their contracts with the State? It will be observed that these contracts with Mr. Huff are executory and continuous—that the contract is not executed in its totality on his part, but he obligates himself to do things day by day for the entire term of his contract.

"It matters not how fair the contract may be; public policy will not uphold it. This principle is iterated and reiterated everywhere in the books. . . .

"It would seem, therefore, to be unnecessary to fortify our own judicial exposition of our own statutes by the authority of courts foreign, or *quasi*-foreign, to us upon cases and questions similar to those declared and ruled by our own courts.

"If need be for other reference, however, we could refer on the same general line to 4 Howard 553; 21 Wallace 182, 616; Kerr On Fraud and Mistake, 160; Wood on Master and Servant, 213, 215; 1 White and Tudor, Lead. Cases in Equity, 72, 115; 2 Johnson's Chancery R. 252; 3 American Reports 105; Zinn's Leading Cases on Trusts, 76, being a great case before the House of Lords, where the chancellor, Lord CRANWORTH, delivered his opinion for reversal, and ex-chancellor, Lord BROUGHAM, concurred, both opinions being in point on this question, it being held that a director of a railroad company could not contract with the company; 25 Wisconsin 551, where it was held that a school commissioner could not contract with the other commissioners to build the schoolhouse. See also Garrison v. Chicago, The Reporter 166; 1 Perry on Trusts, 59, 194, 206, 207, 209, 210; Smith v. City of Albany, 61 N. Y. 444. Indeed the books abound in the general principle—sometimes and under some circumstances annulling absolutely the contract—at others and under other circumstances on terms; but we rest the case confidently upon the great fundamental principle that the mayor is paid to superintend all this

work done for the city—that he is her administrative
and executive officer, to see that the work is well done—
that it is wholly unreasonable and against all public
policy, therefore, that he be permitted to make a con-
tract to do what his official duty makes him superin-
tend and oversee, and holds him responsible for. [Code
of Macon, section 83.] In respect to contracts about
the purchase of lots for homes or things of that sort,
this case, it will be seen, is put on a different basis;
and of course is wholly unlike the contract for the
mayor's salary.

"2. But it is urged that the contract has been
ratified, and that even if originally illegal, it is now
good. Ratified how? By whose authority? The mayor
has been the head of the city government ever since
the contract was made, and if it could not be made
with him whilst he was the head of the government
and part of the council, having the right to give the
casting vote, it is difficult to see how and by what com-
petent authority it has been ratified. If a clean mayor
and council, of which Mr. Huff was not a member,
should do any act or omit to do any act, by which,
either by their conduct or acquiescence, this contract
was ratified, we are of the opinion that it could be
ratified; because as such council and mayor could orig-
inally make a legal contract with Mr. Huff, he not being
the head thereof, there is no reason why it should not
ratify an old one. It would be just the same in effect
as if they had made a new one when they ratified the
old.

"But as the supposed ratification could have been
made, and the acts which it is argued amount to it were
done by the same council which originally did the il-
legal thing, and by another council down with the same
complaint, Mr. Huff still being similarly related to
both, no act or omission to act on their part can so
operate as to make this contract legal by ratification.
It is true that Mr. Huff has been elected mayor since

the making of these contracts, and since they were probably generally known, but certainly unless the question was by competent authority derived from an act of the Legislature or the charter, submitted to vote, the only lawful mode in 'which the corporation can act, either to make or ratify a contract, is through the mayor and council, and it would be folly to hold that a contract, illegal because made by one who was mayor when it was made with the council of which he was head, could be ratified by a council of which he was still the head. We hold, therefore, that no act or conduct on the part of the city through its authorized agents has in law operated to ratify and legalize this originally illegal contract.

"3. But, nevertheless, it is a universal principle of equity that whosoever enters her courts as a suitor must cleanse himself at the threshold, and that she will administer relief to no complainant who fails or refuses to do equity to himself.

"Before, therefore, this complainant can have any relief in equity, it must do equity itself. Certainly it must do so where the chancellor is satisfied that there is no actual or intentional fraud on the part of the defendant, and that public policy alone demands that the law be enforced and the contract be rescinded or annulled. This seems to have been the idea of Lord Brougham in Aberdeen Railway Company v. Blaikie Bros., Zinn's Lead. Cases on Trusts, 76, where the case of York Building Company v. MacKenzie is cited, and where even ornamental improvements were required to be paid for, though the sale was annulled. That case is a very strong authority to invalidate these contracts at bar as illegal; but it seems, also, from the opinion of Lord Brougham before the House of Lords, where the case was determined, to be an authority for paying Mr. Huff back what he has expended, with interest thereon, in the absence of fraud on his part. That case, too, disposes of all that has been urged about the

custom of former members of council to buy and deal with the city of Macon, of whom a long list, running back many years, is given in the record; but no case, so far as we see, of the mayor taking a contract to do work 'which his official duty required him to supervise.

"Certainly, however, it is right and equitable that Mr. Huff should be paid by the city that which he has spent, and of which the city will reap the benefit. It would be grossly unjust to hold otherwise, and, when this case is tried, this equitable principle will be applied to it."

But independent of these general observations, let us return to said section 8336. It, in express terms, provides that no commissioner shall during his term of office be interested, directly or indirectly, in any contract for the construction of any ditch, drain or levee in such district, or in any wages or supplies to men or teams employed on any such work. If it be conceded, and we suppose it is conceded, as it is not denied, that the commissioners had the power and authority under said sections 8328 and 8335 to employ an engineer and to agree to pay him five dollars a day for his services as such, then that contract of employment is in direct violation of that clause of section 8336 which says no commissioner shall be interested in any contract for the construction of any drainage system in such district, for the obvious reason that the work of the engineer in the construction of said improvements is the most important part thereof, and doubtless is the highest-priced laborer employed upon the works; and in this particular instance his salary was fixed at five dollars a day, three-fifths more than that fixed by law for the commissioners. If we take the opposite view of those sections and hold that the commissioners had no authority to employ an engineer and that therefore there was no contract between respondent and the commission regarding services as engineer upon said improvements, then he could not recover upon the con-

tract of employment, for the reason that there would
be no valid contract in force obligating the district to
pay him for his services. So, in either event, he could
not recover upon the contract made by him with the
other two commissioners. These views are supported
by the case of King's Lake Drainage and Levee Dis-
trict v. Jamison, 176 Mo. 557.

If we correctly understand the contention of coun-
sel for respondent, they do not seriously controvert the
contention of appellant, which is to the effect that the
contract by which respondent was employed as en-
gineer for the district is void because it violates said
section 8336; but they seek to escape the provisions of
that statute by insisting that since the district has re-
ceived the benefit of his services, it should not now be
permitted to repudiate said contract and decline to
pay him for said services; and that in equity and in
good conscience it should be estopped from pleading
its invalidity. In support of that contention counsel
for respondent cite and rely upon the following cases,
among others: Niles v. Muzzy, 33 Mich. 61; Macon v.
Huff, supra; Argenti v. San Francisco, 16 Cal. 256.

In the case of Niles v. Muzzy, supra, the facts were
these: Muzzy was mayor of the city of Niles and was
employed as an attorney to appear for and defend the
city in a suit brought against it by one Young. After
defending the suit, the city declined to pay Muzzy his
fee for the legal services rendered by him in the case
upon the ground that the contract of employment was
void for the reason that it violated sound public policy.
The Supreme Court of Michigan in that case held that
there was nothing in Muzzy's relations to the city to
preclude his recovering the value of his fees. In dis-
cussing that question the court used this language:
"Having rendered these valuable professional ser-
vices, it is now objected that he ought not to be paid
for them because he was mayor and councilman. There
is no question open in regard to their worth to the city,

or as to the necessity there was for them. Every such consideration is closed by the finding. Neither his duty as mayor, nor as councilman, nor as both, included any such service. He was no more required, in consequence of his official position, to employ his time and talents as a counsellor-at-law in conducting a suit brought against the city, than he was to pay the debts of the city out of his own private funds.''

We have heretofore referred to and quoted from the case of Macon v. Huff, supra.

In the case of Argenti v. San Francisco, 16 Cal. 1. c. 282, Chief Justice FIELD, afterwards one of the justices of the Supreme Court of the United States, in discussing this question, used this language: ''If the city obtain the money of another by mistake, or without authority of law, it is her duty to refund it—not from any contract entered into by her on the subject, but from the general obligation to do justice which binds all persons, whether natural or artificial. If the city obtain other property which does not belong to her, it is her duty to restore it; or if used by her, to render an equivalent to the true owner, from the like general obligation. In these cases she does not, in fact, make any promise on the subject, but the law, which always intends justice, implies one; and her liability thus arising is said to be a liability upon an implied contract, and it is no answer to a claim resting upon a contract of this nature to say that no ordinance has been passed on the subject, or that the liability of the city is void when it exceeds the limitation of $50,000 prescribed by the charter. The obligation resting upon her is imposed by the general law, and is independent of any ordinance, and the restraining clauses of the charter. It would be, indeed, a reproach to the law, if the city could retain another's property because of the want of an ordinance, or withhold another's money because of her own excessive indebtedness.''

It will be seen that in none of those cases, without it is the California case, was there a statute prohibiting the parties thereto from making the contracts involved therein.

This question was also before this court in the case of Sparks v. Jasper County, 213 Mo. 218, and on pages 236 to 243, the court used this language:

"4. The defendant sets up in its answer divers counterclaims and set-offs, aggregating about $15,000, for money paid by the county to plaintiff for bridges constructed by him in years gone by, under various contracts, which defendant alleges were illegally let to plaintiff.

"It is not alleged that the bridges were not constructed according to the terms of the contract, or that they were not worth the sums of money paid therefor; nor is it alleged that the county refused to receive the bridges, while, upon the other hand, the evidence shows that the contracts for constructing these bridges had been fully performed on both sides long prior to the institution of this suit. The record also discloses the fact that the contracts for their construction were fair and reasonable; that the bridges were substantially built and were reasonably worth the money paid by the county for them; and that they were accepted by the county and that they have been retained and constantly used by the public ever since, with no offer to return them to the plaintiff.

"Under those circumstances, conceding for argument's sake the contracts were illegal in their inception, yet it would be unjust and inequitable to permit the county to retain the bridges and at the same time recover back the money paid therefor. That principle of equity should apply here which requires persons who seek equity to do equity before their prayer will be heard.

"This is no novel question to the jurisprudence of this country. The law is that where there has been a

complete performance of the contract on both sides, and it is fair and reasonable in fact, there can be no recovery of the consideration by the municipal corporation where it retains and enjoys the benefits of the contract, and where it cannot or will not restore the property acquired by the contract, even though the contract be one which the law denounces as illegal and which could not be enforced on that account. [Frick v. Town of Brinkley, 61 Ark. 397; 20 Am. and Eng. Ency. Law (2 Ed.), 1180; Riverside County v. Yawman & Erbe Mfg. Co., 3 Cal. App. 691, 86 Pac. 900; Long v. Boone County, 36 Iowa 60; Inhabitants of Schell City v. Rumsey Mfg. Co., 39 Mo. App. 264.] .

"In Frick v. Town of Brinkley, supra, a member of the city council (prohibited by law from making contracts with the city) sold the city a lot of tiling and received payment therefor. Subsequently an action was brought to recover the purchase price without returning the tiling. The court say: 'We think it [the town] cannot in good conscience be allowed to receive the value back, while at the same time it is enjoying the benefits of its purchase—at all events, when it does not even offer to restore that which it claims could not have been its property, and, consequently, is not now its own. This is not the assertion of any right which the appellant has, nor any obligation resting upon the appellee under the contract of purchase, but it is a rule of justice and right growing out of an implied contract and obligation of every one, whether a natural or artificial person, to restore to another that which belongs to him and that is in the possession of the former or in his power to restore; and when the power to restore does not exist, or when a restoration in the nature of things became impracticable, then to be precluded from recovering back the fair price paid. In such cases as this the sole duty of the courts seems to be to see that the public corporation suffers no ma-

terial loss or injustice, but further than this they could
but inflict burdens upon others more or less disas-
trous, where no resulting good can follow—a thing
courts of justice ought not to indulge in.'

"In Riverside County v. Yawman & Erbe Mfg.
Co., supra, the court say: 'It affirmatively appears
from the complaint that the board of supervisors has
purchased, paid for, and retained the use of certain
personal property, and a court is asked to compel
restitution with penalty in favor of such purchasers.
The Legislature never contemplated conferring such
power upon a public corporation when it enacted sec-
tion 8 of the County Government Act. The right there
sought to be conferred was to recover money paid with-
out authority at law. To say that one who receives
property under a contract that the owner retains and
uses it is not authorized by law to pay for it would be
to say that a public corporation may take and use prop-
erty for public purposes without compensating the
owner, provided they can once get possession of it
under the guise of a contract; and to say that they may
recover the purchase price actually paid without ten-
dering back that which they have received, would be to
say that our Legislature intended to discourage com-
mon honesty, as applied to public corporations, and
that the courts were to be made the "handmaidens of
iniquity.'"

"In Long v. Boone County, 36 Iowa 60, quoted
with approval in King v. Mahaska County, Iowa, 75
Iowa 336, it was held: 'When the legally constituted
agent of the county contracts for work in respect to
which he has no power unless authorized by a special
vote of the people, and executes a warrant for the
amount thereof to the treasurer of the county, which is
voluntarily paid by the latter officer, the county can-
not recover back the amount so voluntarily paid.'

"While some of the expressions in the case of
King v. Mahaska County, 75 Iowa 329, seem at first

blush to support defendant's contention, when critically considered it will be seen that it distinguishes that case from the case of Long v. Boone County, 36 Iowa 60, by using the following language, on page 336: 'When all the pleadings are considered the defendant was not in the attitude of seeking to recover back money paid to the plaintiff on these illegal contracts.'

"The Supreme Court of the United States and courts of last resort of many of the States go much further in the adjustment of the rights of parties growing out of illegal contracts than this court has. In other words, they grant not only the relief this court grants, but they go much further and relieve where this court will not do so, as will appear from the following cases:

"The Supreme Court of the United States, in the case of Chapman v. County of Douglas, 107 U. S. l. c. 357, in discussing this question, used this language: 'This doctrine was fully recognized by the Supreme Court of Nebraska as the law of that State in the case of Clark v. Saline County, 9 Neb. 516, in which it adopts from the decision of the Supreme Court of California the following language: "The city is not exempted from the common obligation to do justice which binds individuals. Such obligations rest upon all persons, whether natural or artificial. If the city obtain the money of another by mistake or without authority of law, it is her duty to refund it, from this general obligation. If she obtain other property which does not belong to her, it is her duty to restore it, or, if used, to render an equivalent therefor from the like obligation. [Argenti v. San Francisco, 16 Cal. 282.] The legal liability springs from the moral duty to make restitution." '

"The same rule is announced in the following cases: Louisiana v. Wood, 102 U. S. 294; Marsh v. Fulton Co., 77 U. S. l. c. 684; Hitchcock v. Galveston, 96 U. S. l. c. 351; McBrian v. Grand Rapids, 56 Mich.

103; 1 Beach on Pub. Corp., sec. 227. These cases are but samples of the overwhelming authorities which hold that where a moral duty exists to make satisfaction, a legal liability springs therefrom, and as said by the Supreme Court of the United States in the case of Hitchcock v. Galveston, supra: 'There may be a difference between the case of an engagement made by a corporation to do an act expressly prohibited by its charter or some other law, and a case of where legislative power to do the act has not been granted. Such a distinction is asserted in some decisions. But the present is not a case in which the issue of the bonds was prohibited by any statute. At most, the issue was unauthorized. At most, there was a defect of power. The promise to give bonds to the plaintiffs in payment of what they undertook to do was, therefore, at farthest, only *ultra vires;* and, in such case, though specific performance of an engagement to do a thing transgressive of its corporate power may not be enforced, the corporation can be held liable on its contract. Having received benefits at the expense of the other contracting party, it cannot object that it was not empowered to perform what it promised in return, in the mode in which it promised to perform. This was directly ruled in State Board of Agriculture v. Railroad, 47 Ind. 407. There it was held that: ''Although there may be a defect of power in a corporation to make a contract, yet if a contract made by it is not in violation of its charter, or of any statute prohibiting it, and the corporation has by its promise induced a party relying on the promise and in execution of the contract to expend money and perform his part thereof, the corporation is liable on the contract.'' See, also, substantially to the same effect, Allegheny City v. McClurkan & Co., 14 Pa. St. 81, and, more or less in point, Maher v. Chicago, 38 Ill. 266; Oneida Bank v. Ontario Bank, 21 N. Y. 490; Argenti v. City of San Francisco, 16 Cal.

256; Silver Lake Bank v. North, 4 Johns. (N. Y.) Ch. 370.'

"The same is true of the case at bar. Jasper County was not prohibited by statute from building bridges; but, upon the other hand, the statute expressly grants to the county that power.

"Conceding the contracts for building the bridges were illegal, yet the execution of those contracts was, at most, a defective exercise of the power granted; and when the bridges were constructed in pursuance thereof and accepted by the county, then she was, to say the least, morally bound, in the absence of fraud, to pay them, if not legally bound to do so, which she is not under the decisions of this court. [Wolcott v. Lawrence County, 26 Mo. 272; Anderson v. Ripley Co., 181 Mo. 46; Woolfolk v. Randolph Co., 83 Mo. 501; Crutchfield v. Warrensburg, 30 Mo. App. 456.]

"The conclusions reached in these cases are correct and rest upon sound reason. They were suits based upon contracts not in writing, etc., which were prohibited by statute, and the court in those cases simply enforced the statute as it found it, and to have done otherwise would have given force and effect to contracts which were prohibited by statute from being made. [Roeder v. Robertson, 202 Mo. l. c. 537.]

"But that is not the question involved in this case. Here the plaintiff is not asking this court to enforce these alleged illegal contracts. They were years ago fully performed on both sides; and the defendant is now here by way of counterclaim, in the nature of a crossbill, seeking to recover back the money she paid for those bridges without an offer to return them to the plaintiff. This she cannot do without she first returns, or offers to return them to him; and the reason therefor is this: If the contracts were void, then the title to the bridges never passed thereby from plaintiff to the defendant and became her property; but they

remained his property the same as though the contracts had never been entered into. That being true, then when the county acquired the possession of the bridges under those void, yet colorable, contracts, she was morally bound to pay for them, as she did; and conceding, as before stated, without deciding it, that, after accepting the bridges and paying for them, she had the right to repudiate the contracts and sue for the recovery of the money paid by her for them, she would be morally bound, and from that springs the legal liability, to return the bridges to plaintiff before she would be permitted to recover back the contract price so paid. This same principle underlies the case of Roeder v. Robertson, 202 Mo. 522, and on page 535, this language is used: 'The act is prohibitive in its operation. It seeks to prevent foreign corporations from doing business in this State until they have complied with the provisions of the act by filing a copy of their charter or articles of incorporation with the Secretary of State, and by appointing an agent in this State to represent them. If such corporations, in violation of the act, do business in this State, all such transactions are, by the courts, declared null and void, and all contracts made by them with citizens of this State for the sale of goods, wares and merchandise are nullities, and the title sought to be transferred thereby does not pass to and vest in the vendee, but remains in the vendor, the same as if the pretended contract had not been executed. . . . For under the facts of this case a citizen of this State would not be permitted to recover the possession of the property sold to the respondents, nor its value, in case of its conversion, without first refunding or paying back to the respondents the consideration paid by them under the void contract, and received by A. W. Stevens & Son. He would be estopped from claiming the property until the purchase price has been returned.' [Simpson v. Stoddard Co., 173 Mo. 421.]''

To the same effect is the case of Hitchcock v. Galveston, 96 U. S. 341, l. c. 350, 351. There are many other cases of like import, and all of them involved one or more of the following legal propositions regarding public corporations, to-wit:

First. That where the corporation has the power to make the contract but the law requires it to be made in a particular manner, such as where it is provided that the contract shall be awarded to the lowest and best bidder, then in such cases where the contract was not awarded to the lowest and best bidder, or where it was not reduced to writing, but had been fully executed, in good faith, by the obligee in the contract, then the city will not be allowed to repudiate the contract and escape the liability upon that ground alone, but in such cases the courts will compel payment where the corporation retains the benefits received under the contract, and by virtue of its having been executed.

Second. That where the corporation is absolutely prohibited from making the contract, or from making it with certain designated persons, then in such case where, for instance, the contract increased the indebtedness of the corporation beyond the constitutional limit, or where it was made with one of those when the statute absolutely prohibited it from being made, then the corporation will not be estopped from repudiating the contract, or be required to pay the consideration expressed therein, even though the obligee has in good faith fully executed the contract upon his part. But in such cases it would seem the obligee would have the right to recover back from the corporation the subject-matter of the contract where it is capable of being returned, but not otherwise.

Third. That if the contract has been fully executed by both parties thereto, then the corporation will not be heard to say the contract was not let according to law, or that it had no power or authority to enter into the contract, and recover back the consideration

paid by it without it first returns or offers to return the benefits it has received under the contract by virtue of its execution; and even where the corporation in such cases has placed itself beyond the power of making restitution, it will not be permitted to plead the illegality of the contract and recover back the consideration paid. This, the third proposition, rests upon the maxims, "He who seeks equity must do equity," and "He who comes into equity must come with clean hands." [Sparks v. Jasper County, supra.] "He that hath committed inequity shall not have equity." A court of equity is a court of conscience. It searches the consciences of the complainant and defendant, and will give the former no relief where he occupies a wrongful or unjust attitude toward the transaction for which he prays relief, and it also looks into the conscience of the defendant, and compels him to do equity. To the same effect is the case of Union National Bank v. Lyons, 221 Mo. —, 119 S. W. 540.

If we apply the law enunciated in the cases before cited to the case at bar, then respondent is not entitled to a recovery upon the warrants issued to him in payment of his services rendered as engineer to the appellant district, for the reason that the commissioners, by said section 8336, were absolutely prohibited from employing respondent as engineer to do the engineering work of the district.

We are, therefore, of the opinion that the court should have given the instructions asked for by counsel for appellant, and that its refusal to do so was error.

The judgment is, therefore, reversed, and the cause remanded with directions to the circuit court to enter judgment for the appellant on the first, second, third, fourth, fifth, sixth, seventh, eighth, twelfth and thirteenth counts of the petition, and for all sums sued for in the fourteenth and sixteenth counts, which were allowed respondent for services performed by him as engineer, and enter judgment in favor of respondent

for the remaining sums sued for in said fourteenth and sixteenth counts; and also enter judgment in his favor on all of the remaining counts of the petition, with six per cent interest thereon, from the respective dates when the warrants sued on were presented for payment down to the date of the rendition of the judgment hereby ordered to be entered.

All concur.